ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
TriRAD Technologies Inc. ) ASBCA No. 58855
)
Under Contract No. FA3002-11-C-0002 )

APPEARANCE FOR THE APPELLANT: Mr. Rhett Reardin
　　Director

APPEARANCES FOR THE GOVERNMENT: Lt Col James H. Kennedy III, USAF
　　Air Force Chief Trial Attorney
Gregory A. Harding, Esq.
John Pettit, Esq.
　　Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE CLARKE

This appeal involves the termination for convenience of a commercial items contract for ten aircraft simulators for Randolph Air Force Base (AFB). The parties disagree over the amount owed TriRAD by the Air Force pursuant to the commercial items termination for convenience clause. The Board has jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA) 41 U.S.C. §§ 7101-7109. We decide entitlement and quantum. We sustain the appeal.

FINDINGS OF FACT

*Contract No. FA3002-11-C-0002*

1. Contract No. FA3002-11-C-0002 (0002) was a commercial items contract awarded to TriRAD Technologies Inc. (TriRAD) on 28 February 2011. The contract required TriRAD to deliver a total of ten FAA certified fixed training device flight simulators for the T-6A Texan II aircraft. (R4, tab 1; tr. 2/39-40) The total fixed-price was $2,445,200.00 (R4, tab 1 at 1 of 28).

2. Delivery of the first simulator was due on 15 June 2011, the second on 15 August 2011, and the remaining eight, one every month commencing on 1 October 2011 (R4, tab 1 at 3 of 28). The contract included clauses utilized for commercial items including FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUN 2010) (*id.* at 5 of 28). Paragraph 4, Additional Contract Requirements, stated that TriRAD must provide on-site instructor training with the delivery of each simulator (R4, tab 1 at 28 of 28; tr. 2/41).

3. FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUN 2010), includes the following:

(l) *Termination for the Government's convenience.* The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

4. Contract 0002's Statement of Need (SON), 20 December 2010, reads in part as follows:

## 1.0 DESCRIPTION OF NEED:

Air Education & Training Command, Chief, Undergraduate Flying Training and Standardization Division (HQ AETC/A3F) has a need to purchase a Federal Aviation Administration (FAA) commercial off-the-shelf (COTS) IFR Flight Simulator, Fixed Training Device (FTD)/Flight Simulation Device (FSD), that will be used in Undergraduate Remotely Piloted Aircraft (RPA) Pilot Instrument Qualification training.

A Simulator/Professional Airplane Simulator (PAS), Fixed Training Device (FTD), Flight Simulation Device (FSD), that is able to become FAA FTD Level 5 certified IAW 14 CFR Part 60, Appendix B, and that may be used in accordance with Federal Aviation Regulations for Instrument Flying Training. FAA certification must occur within 1 year of the first Simulator delivery, 15 June 2012.

2

(R4, tab 1 at 25-26 of 28) The SON also included, in pertinent part, paragraph 2, Scope of Work (2.1.1-2.1.3), paragraph 3, Technical Description (Hardware profile, 3.1.1-3.1.8, Software profile, 3.2.1-3.2.6, and Sustainability, Vendor Support, Database Updates, 3.3.1-3.3.3) (*id.* 26-28 of 28) These were all narratives of performance requirements. For example, paragraph 2.1.1 reads:

> 2.1.1 Training in the basic category, contact category, and instrument category must be supported. Formation training is not required. A student pilot shall be able to operate the simulator without instructor support.

(R4, tab 1 at 26 of 28)

5. SON, paragraph 4, Additional Contract Requirements, reads:

> The vendor must supply training for our Instructor Force with delivery of each simulator. The vendor will provide on-site Instructor training (3 day, 8 hours per day) in San Antonio, TX for each of the simulators delivered. AETC will provide the facilities for the vendor's training. The Simulator/Professional Airplane Simulator (PAS), Fixed Training Device (FTD), Flight Simulation Device (FSD), shall be FAA FTD Level 5 certified IAW 14 CFR Part 60, Appendix B within 1 year of the first Simulator delivery, 15 June 2012. Final payment is contingent upon attaining FAA certification.

(R4, tab 1 at 28 of 28)

*Delivery and Testing of the First Simulator*

6. On 13 June 2011, TriRAD notified the Air Force that due to an unexpected delay in receiving the display system it would not be able to deliver the first unit on 15 June 2011 (R4, tab 3). On 28 June 2011 CO Pritchett wrote TriRAD expressing concern that delivery of the first simulator had not yet occurred (R4, tab 4).

7. Mr. Ham is a simulator instructor at the 558 Flying Training Squadron at Randolph AFB (tr. 2/122). When the first simulator was delivered to Randolph AFB on 20 June 2011, Mr. Ham conducted testing (tr. 2/126; R4, tab 6 at 1). The testing occurred on 11 and 12 July 2011 (tr. 2/127). A second test took place on 26 July 2011 (tr. 2/127-28). The results of the inspections are in the record and consists of three columns; the first lists the performance requirement paragraphs of the SON, the second identifies the tests and present the results of the 11-12 July testing and the third presents the results of the 26 July 2011 testing (R4, tab 6 at 5-14; tr. 2/128). The record also includes a version of this table with a column listing TriRAD's comments after the

3

11-12 July 2011 test results (ex. G-28). Mr. Ham testified about the performance of the first simulator, "[b]ut if I looked at it based on our training syllabus and what we had to -- what we would have to do with that sim, what our job is, to train RPA students, the sim was of no use to us in our training program" (tr. 2/138). There was no evidence of what the "training syllabus" referred to by Mr. Ham was or what it contained; there is no copy of it in the record or no explanation that by "training syllabus" Mr. Ham was referring to the SON. Mr. Ham thought the problems were due mostly to software issues (tr. 2/138. Mr. Ham agreed that TriRAD's simulator did "fly" and they could accomplish pieces of the mission but not the whole mission (tr. 2/147). CO Pritchett testified that the first simulator that TriRAD delivered would turn on and he saw it "fly"—it was a "working simulator"—but it did not meet 100% of the requirements (tr. 2/53).

*FAA Certification*

8. Mr. Ham was asked why TriRAD's simulator was not inspected based on the FAA Level 5 requirement and he responded:

> Well, one thing is, first off, Level 5 is kind of the minimum requirement that's needed. We had a basic outline that said what Level 5 needed to be and what Level 5 needed to do. But the sim was so deficient in meeting the statement of need we never even got to the technical part of the Level 5 stuff and FAA would have been the one that certified it. But Level 5 is kind of just the minimum. The statement of need was what we were actually looking at.

(Tr. 2/142) At the Board's request the government included a copy of FAA Appendix B to Part 60 – Qualification Performance Standards for Airplane Flight Training Devices in the Rule 4 (R4, tab 53). Other than Mr. Ham's testimony quoted above, the government presented no testimony on FAA Appendix B to Part 60. The first paragraph in FAA Appendix B to Part 60 reads:

> This appendix establishes the standards for Airplane FTD evaluation and qualification at Level 4, Level 5, or Level 6. The Flight Standards Service, NSPM, is responsible for the development, application, and implementation of the standards contained within this appendix. The procedures and criteria specified in this appendix will be used by the NSPM, or a person or persons assigned by NSPM when conducting airplane FTD evaluations.

4

(R4, tab 53 at 1) Table B1A, Minimum FTD Requirements, presents in tabular form the "General FTD requirements" for Levels 4, 5, and 6 (R4, tab 53 at 12-16). There are other requirements in tabular form: Table B1B, Table of Tasks vs. FTD Level; Table B1C, Table of FTD System Tasks QPS Requirements; Table B2A, Flight Training Device (FTD) Objective Tests; and others through B3A (*id.* at 16-18, 21-45). None of these tables were explained by government witnesses, however, FAA Appendix B to Part 60 clearly presents details of performance requirements for FAA Level 5 certification applicable to the simulators delivered by TriRAD per Contract 0002's SON (R4, tab 1 at 26 of 28).

*Termination for Cause*

9. On 3 August 2011, by contracting officer's final decision (COFD) signed by Janelle J. Larrison, CIV, DAF, termination contracting officer (TCO), Contract 0002 was terminated for cause based on the two inspections conducted by Mr. Ham (R4, tab 6). Contract Modification No. P00002 implemented the termination for cause (R4, tab 7). Mr. Reardin testified that TriRAD stopped working on the simulators as of the date of the termination (tr. 1/107,[1] 191, 218). Mr. Reardin's testimony is corroborated by contemporaneous email (R4, tab 33). CO Pritchett testified that after the termination, TriRAD offered to pay for the Air Force to travel to TriRAD and inspect and "fly" Unit 2 (tr. 2/101-02). CO Pritchett explained that they did not accept TriRAD's offer because the contract was terminated and "[t]here's no going back" (tr. 2/102).

10. In August 2011 the Air Force learned that TriRAD had submitted an invoice for the first simulator and was paid by the Air Force in the amount of $248,600.00 (R4, tabs 8, 9).

11. TriRAD's appeal of the termination for cause was docketed as ASBCA No. 57740 on 17 August 2011 (R4, tab 11).

12. On 2 September 2011, by COFD signed by TCO Larrison, the Air Force demanded the repayment of the $248,600.00 erroneously paid to TriRAD (R4, tab 13). TriRAD appealed that final decision and the appeal was docketed as ASBCA No. 57820 on 28 October 2011 (R4, tab 14).

13. The government included TriRAD's responses to government interrogatories in the Rule 4 (R4, tab 15). TriRAD's response to interrogatory 5 asking if the SON was "not accurate" read in part:

> **TriRAD** provided a training device that included every
> system identified in the SON (i.e., as per paragraph 3.2.3, the
> VOR, DME, ILS, LOC, ASR/PAR, and GPS/RNAV). These
> systems were noted in the SON, but there were no specific

---

[1] He also testified that some work was done twelve days after termination (tr. 1/115).

details regarding the extent of their operation. The details would have been included in either a Technical Specification or a Statement of Work. These types of documents are standard and should have been provided for a training device such as the T-6A, especially when the FAA Level 5 FTD requirements were included. None of these documents were included in the RFQ or SON.

(R4, tab 15 at 4) TriRAD reiterated this contention in its reply brief:

TriRAD contends that the SON and Scope of Work were not a detailed technical specification that is always required for a complex simulator device. The SON and Scope of Work lacked any significant detail relating to the specific training requirements of the USAF RPA Program.

(App. reply br. at 16) TriRAD contends, "[t]here are no testing requirements noted in the SON or the Contract other than its reference to the FAA certification" (app. reply br. at 86). In other responses to interrogatories TriRAD noted that the SON provided that TriRAD had one year to attain FAA Level 5 certification (R4, tab 15 at 5, tab 16 at 9).

*Termination for Convenience*

14. By letter dated 24 October 2012 the Air Force converted the termination for cause to a termination for convenience (R4, tab 17).[2] The Air Force referenced FAR 52.212-4(l), Termination for the Government's convenience, and stated that TriRAD could submit a written request for termination for convenience costs (*id.*). CO Pritchett testified that TriRAD was erroneously paid for the first simulator, but that allowing them to keep that payment was "the fair thing to do" (tr. 2/54).

*Termination for Convenience Settlement Proposal*

15. On 3 November 2012, TriRAD submitted its termination for convenience settlement proposal in the amount of $1,803,993.00 (R4, tab 19). This amount was comprised of $1,494,382.00 for 61.11% completion at termination for cause plus $558,211.00 for unavoidable charges between August 2011 and October 2012 minus $248,600.00 paid for the first unit (*id.* at 3). The proposal included an SF 1436, Settlement Proposal (Total Cost Basis), with the pre-printed certification on page 4 of the form (*id.* at 13-16). The SF 1436 was signed by Mr. Reardin (*id.* at 16). TriRAD included a table that listed the major components installed in the simulator cockpit, and the percent of completion for each component for each of the ten simulators. TriRAD

---

[2] As a result of the conversion, ASBCA Nos. 57740 and 57820 were dismissed with prejudice on 14 November 2012 (R4, tab 20).

listed the first two simulators as 100% complete, Unit 3 at 97%, Unit 4 at 71.9%, Unit 5 at 55.7%, Unit 6 at 38.7%, Unit 7 at 30.9%, Units 8, 9 and 10 at 20.6%. (*Id.* at 7)[3] TriRAD described the methodology it employed to calculate percentage completion as follows:

1. The simulator's overall top assembly is shown in drawing No. 106170100 (T-6 Level 5 Trainer, attached). There are 5 main assemblies for each T-6 Level 5 Trainer. See page 6

   a. Other than the cockpit assembly, the 4 other assemblies are comprised of mainly commercial off-the-shelf purchased items (i.e., computers, projectors, gantry, etc.) The exception is the Dome Hemisphere assembly which was manufactured to meet FAA Level 5 certification requirements.

   b. Except for the Cockpit assembly, the above items are purchased and then require minimum assembly except the Cockpit assembly.

2. The main simulator part is the Cockpit Assembly as shown in drawing No. 106120100 (attached). See page 8

   a. There are 14 major assemblies associated with the cockpit. The cockpit is a **TriRAD** custom made assembly. These assemblies are listed on the spread sheet labeled "Major Cockpit Assemblies Completed at Termination for Cause (August 3, 2011)". See page 7
   b. There are over 200 individual subassembly parts associated with the major assemblies.
   c. Over 80 parts (i.e., switches, electronic components, etc.) were ordered for all 10 simulators.
   d. Most of the parts are to be installed in the various subassemblies (e.g., the Main Instrument Panel assembly which **TriRAD** had purchased all of the backing panels for the remaining 8 units).
   e. The Main Instrument Panel represents the most complex and labor intensive major cockpit assembly of the simulator. Other major hardware components include the Throttle Quadrant, the Control Stick and the Adjustable Rudder Pedals. These four major

---

[3] These percentages are slightly higher than the percentages TriRAD included in its interrogatory responses (R4, tab 16 at 11).

assemblies represent around 70% of the TriRAD effort.

The percentage of completion is based on the existence of materials (in-house) and assemblies that were available at the Termination for Cause work stoppage. At the time of the work stoppage, **TriRAD** had completed work on the subassemblies as noted in the Major Cockpit Assemblies Completed at Termination for Cause (August 3, 2011) table. (See page 7) At the time of the work stoppage, **TriRAD** had 10 technical people working on the program and the remaining Units. It would take approximately 1232 man hours for the **TriRAD** technicians to create and test the Major Cockpit Assemblies for each Unit.

(R4, tab 19 at 4-5)

16. By letter dated 10 December 2012, CO Pritchett requested additional information from TriRAD in support of its settlement proposal including among other things invoices, receipts, billings, G&A, overhead, profit, employee records/timecards etc. (R4, tab 21). CO Pritchett testified that he wrote the 10 December 2012 letter to TriRAD requesting additional supporting documentation to validate the percentage of completion of each simulator, start-up costs, employment/payment records, facilities and utilities records, and other documents supporting the claim (tr. 2/45; R4, tab 21). CO Pritchett testified that TriRAD's claim "didn't give me the whole story" and he wanted information of such things as labor, overhead, G&A, profit, and receipts even though he realized that since this was a commercial items contract he could not force TriRAD to provide that information (tr. 2/60-62). On 13 December 2012, a teleconference was held between Mr. Reardin and CO Pritchett concerning the government's request for supporting information (R4, tab 22; tr. 2/46-47). Mr. Reardin was unsure how they could provide the requested information and stated he felt the percentage table and explanation should be sufficient (*id.*). CO Pritchett again requested receipts, invoices, billings, payroll records, etc. (*id.*). CO Pritchett testified that he couldn't just take TriRAD's word for the claimed costs and that he worked with Mr. Reardin to help him understand how to support the claim (tr. 2/48-49). During the call CO Pritchett mentioned the possibility of a site visit by the government to allow TriRAD to explain its percentages. TriRAD did not agree to a site visit (*id.*). On 17 December 2012 TriRAD responded in writing to CO Pritchett's 10 December 2012 letter and included 283 pages of additional information including invoices and receipts (R4, tab 23). TriRAD provided additional information on 29 January 2013 (R4, tab 25). CO Pritchett agreed that TriRAD provided almost everything he requested (tr. 2/103-04, 116).

17. On 6 March 2013 CO Pritchett emailed Mr. Reardin stating that the government was having difficulty finding ample substantiation in the information submitted by TriRAD

(R4, tab 26). CO Pritchett suggested that a site visit would be useful and stated that if TriRAD would not agree to a site visit he would need additional labor records, material receipts, production/start-up information, etc. (*id.*). On 11 March 2013 TriRAD submitted an additional 152 pages of payment vouchers (R4, tab 28).[4] On 22 March 2013 TriRAD submitted utility bills and time sheets for Mr. Daab,[5] Mr. Reardin and Ms. Price (R4, tab 31). CO Pritchett did not agree to pay for any other wages for Mr. Reardin, Mr. Daab, or Ms. Price because they continued essentially full time fighting the termination for cause and then working on the termination for convenience (tr. 2/72). The employee termination settlement costs were not required payments and there was no documentation that they were actually paid (tr. 2/73). CO Pritchett continued to ask questions about invoices and vouchers and Mr. Reardin continued to respond during May 2013 (R4, tabs 32-36). CO Pritchett testified that he requested payroll records and other production costs because he could not rely on TriRAD's percentage of completion claims (tr. 2/78-84). He testified that there was nothing in the contract that would allow him to pay for a partially completed simulator (tr. 2/84).

18. On 29 May 2013, CO Pritchett issued a letter explaining his position on TriRAD's termination for convenience settlement proposal (R4, tab 36). CO Pritchett questioned TriRAD's percentage of completion estimates because "[t]he supporting documentation received from TriRAD during the ensuing months to support this part of its settlement did not come close to adding up to the total amount TriRAD was requesting" (*id.* at 2). He also questioned the "credibility of the percentages" because of the difference between the percentages in interrogatory responses and in the proposal (*id.*). Additionally, TriRAD's refusal to allow a site visit by the government was cited as a reason for his decision (*id.* at 3). CO Pritchett wrote, "[t]herefore, the Government can only determine with certainty that one simulator was produced, so the percentage of completion for one simulator will be allowed in the amount of $248,600.00 (*id.* at 4). CO Pritchett also questioned TriRAD's unavoidable reasonable charges. In addition to allowing TriRAD to keep the payment for the first unit delivered to Randolph AFB, CO Pritchett allowed one month's rent, utilities, and the cost of removing the first unit and transporting it back to Florida for an additional $13,385.84, $7,404.44 of which was for "simulator retrieval" (*id.*). The letter was not identified as a final decision and did not contain appeal rights. CO Pritchett asked TriRAD several times for a site visit so that he could look at the progress TriRAD made on manufacturing the ten simulators to assist him in determining a percentage of completion (tr. 2/51). TriRAD would not allow a site visit (tr. 2/51). CO Pritchett did not receive any pictures of the simulators in various stages of completion until 2013 (tr. 2/52).

---

[4] Mr. Reardin testified that TriRAD did not keep formal payroll records and that the documents in the claim were reconstructed at the request of the government based on his best recollection of what TriRAD paid (tr. 1/188-89).

[5] Mr. Daab was TriRAD's program manager (tr. 1/201-02).

19. The record includes a second letter from CO Pritchett, dated 11 June 2013, wherein he reiterated the position he took in his 29 May 2013 letter (R4, tab 37). This letter was not identified as a final decision and did not contain appeal rights. CO Pritchett signed unilateral Modification No. P00004, dated 11 June 2013, adding the $13,385.84 to the contract (R4, tab 38).

*Impasse*

20. By email dated 13 June 2013, to the ASBCA and CO Pritchett, TriRAD, referring to its 3 November 2012 settlement proposal as a "Certified Settlement Proposal," rejected the government's settlement offer of $13,385.84 and stated that it would ask the ASBCA for assistance (R4, tab 40). On 19 June 2013, CO Pritchett responded to TriRAD's 13 June 2013 email and stated that TriRAD had not followed the procedures in the contract's Disputes clause and had not filed a properly certified claim (R4, tab 41).

*Re-Certified Claim*

21. On 1 July 2013, TriRAD submitted its "2nd Revised and re-Certified" claim with a CDA certification (compl., attachment[6]). The total claim amount was $1,861,313[7] comprised of $1,494,382 attributed to a completion of 61.11%, unavoidable charges between 3 August 2011 and 24 October 2012 of $463,052, unavoidable charges between 25 October 2012[8] and 30 June 2013 of $152,479, minus the previous payment of $248,600 (*id.* at 3). The claim included a proper CDA certification (*id.*). The claim included the same narrative from the 3 November 2012 proposal quoted above in finding 15. The claim included four tabs: Tab 1 included start-up costs and 18 pictures of the simulators in various stages of completion and 7 pictures of the facility; Tab 2 documented "Reasonable Charges" between 3 August 2011 and 24 October 2012; Tab 3 documented "Unavoidable Expenses" from 1 November 2012 to 30 June 2013; and Tab 4 documented "Support for Production Costs."

22. Mr. Reardin testified in detail about the 1 July 2013 claim. The drawing on page 6 in the first tab of the claim is a top level drawing illustrating all of the major components of TriRAD's simulator (claim at 6; tr. 1/29). The major components are the gantry with projector equipment, the one-third dome hemisphere, the simulator cockpit assembly and the instructor station on the table with computer behind the cockpit assembly (tr. 1/29-30). The table at page 7, "Major Cockpit Assemblies Completed at

---

[6] TriRAD did not submit its claim as a separate Rule 4 tab. We treat the claim and supporting documents (tabs 1-4) attached to TriRAD's complaint as a Rule 4 document and refer to it as "claim."

[7] The increase over the 3 November 2012 proposal was due to additional "unavoidable costs."

[8] The claim includes a typographical error indicating the date as 25 October 2011.

Termination for Cause (August 3, 2011)" of the claim lists components that go into the simulator cockpit assembly and the percentage of completion at termination for cause on 3 August 2011 based on total hours (tr. 1/30, 36). All of these assemblies go into the cockpit illustrated in the drawing on page 8 of the claim (*id.*). Mr. Reardin testified that the percentage of completion table on claim page 7 included the start-up costs (tr. 1/154). The percentage of completion is based upon the complexity of the assembly and total hours to complete the cockpit (tr. 1/31, 36). For example, FIND No. 5, MIP Assy, is the main instrument panel (MIP) and the 0.357 in the Unit 1 column represents the percentage of the simulator attributed to the MIP based on its complexity and hours required to make the MIP (tr. 1/32, 35). It takes 1232 hours to produce the cockpit (tr. 1/33). The table on page 7 indicates that Units 1 and 2 were 100% complete (*id.*). In Unit 4 the MIP was only 0.173 complete (tr. 1/36-37). TriRAD did not include the dome, projector or gantry as separate items in the table on page 7 because they took just a few hours to assemble (tr. 1/34) and are included in the .014 figure for simulator final assembly (tr. 1/102-03). TriRAD buys licenses for the software and loads it into the simulator at final assembly and it takes less than an hour (tr. 1/152). Mr. Reardin testified that the percentage completion table on page 7 was difficult to develop, but he tried to simplify it as best he could (tr. 1/39). Mr. Reardin developed the percentage of completion table on claim page 7 using his knowledge of the production process and related drawings and other information (tr. 1/157-58). The table on page 9 identifies "Production/Start-up Costs" as: T-6A Study ($7,297), CAD Drawings ($37,703), Wiring Diagrams ($21,892), Sfwr Dev/Mods ($34,054), Mfg Des & Dev ($19,459), and Purchasing ($1,216) for a total of $121,621. The back-up for the production/start-up costs identifies different costs making up the $121,621: $54,062 for Mr. Reardin, Mr. Daab, Mr. Chavez, and Ms. Price (yet to be paid) (see claim at 1-1-2 through -4); $48,360 for VGI (software supplier); $3,800 for Foam by Design; and $15,399 for YounGraphix, Inc., (drawings) (claim at 1-1-1). The difference between start-up costs was not explained. The table on page 10 of the claim multiplies the percentage of completion times the unit price of the simulators to calculate the amount of the claim based on percentage of completion (tr. 1/40).

23. Mr. Reardin testified about pictures in the claim starting on page 1-2-1 under tab 1 (tr. 1/43). All the parts shown in the pictures existed at the time of the original termination for cause on 3 August 2011 (tr. 1/58). The picture on page 1-2-1 shows Units 1, 2, and 3. The second picture on page 1-2-2 shows Unit 1 that was delivered to Randolph AFB (tr. 1/44) The picture on page 1-2-3 shows Unit 2 (*id.*). Simulator 3, partially shown in the picture on page 1-2-4, had a cockpit shell made of wood (tr. 1/76). Mr. Daab testified that the wooden cockpit was the "staging" cockpit that they used for every simulator so that they knew that everything fit (tr. 1/21). The wooden shell was not going to be shipped to the Air Force (tr. 1/78, 117, 187, 2/203). The picture on page 1-2-5 show the MIPs for Units 3 to 10 in various stages of completion (tr. 1/46). The first MIP is for Unit 3 and it was 100% complete (tr. 1/46). The pictures on pages 1-2-6, -7, -8 and -9 show other cockpit assemblies in various stages of completion (tr. 1/47-49). The picture on page 1-2-10 shows partially completed seats for Units 3 and 4 (tr. 1/49).

The picture on page 1-2-11 shows projector shelves (tr. 1/50). The picture on page 1-2-12 shows the control stick and that Unit 3 is complete and Unit 4 is almost complete (tr. 1/50-51). The picture on page 1-2-13 shows bow assemblies that are complete (tr. 1/51). The picture on page 1-2-14 shows the rudder pedals (tr. 1/51). The picture on page 1-2-15 shows master control panels (tr. 1/51-52). The picture on page 1-2-16 shows EFIS control panels (tr. 1/52). The picture on page 1-2-17 shows printed circuit boards (*id.*). The picture on page 1-2-18 shows decals used in the cockpit (*id.*). The remaining pictures on pages 1-3-1 to -7 show the facility (tr. 1/53). Mr. Reardin testified that the residual equipment from the simulator contract takes up a lot of space in TriRAD's facility and he is asking to be compensated for the rent for keeping the equipment (tr. 1/53-54).

24. The table at tab 2 of the claim represents expenses incurred during the termination for cause phase before the termination was converted to one for convenience. During that time they tried to get the government to convert the termination to one for convenience. (Tr. 1/60) One of the itemized costs was for the lease of the facility (tr. 1/60-61). TriRAD was not conducting other business in the facility during that time (tr. 1/61). Mr. Reardin testified that the document at page 2-1-12 represents a lease invoice that was for $4,895.28 (tr. 1/62; claim at 2-1-12). At pages 2-1-13 to -15 is a lease amendment for the TriRAD facility for the period of 17 March 2012 through 16 September 2012 (tr. 1/62, 161). Mr. Reardin testified that they paid the lease (tr. 1/62). CO Pritchett had supporting documentation showing what TriRAD paid for the rent (tr. /68). Mr. Reardin testified that in his view the severance packages were not required by law or contract (tr. 1/164). In the 15 months following the termination TriRAD attempted to reinstate the contract (tr. 1/191). Mr. Reardin and Mr. Daab were still working on trying to get the contract reinstated in 2012 and 2013 (tr. 1/164-65, 184).

25. Mr. Reardin testified that the documents under tab 3 of the claim represented expenses incurred after the conversion to the termination for convenience including rent receipts (tr. 1/63). Mr. Reardin provided no further explanation of the documents in tab 3. Mr. Reardin testified that the documents under claim tab 4 were created for the government (tr. 1/65). The bills and invoices under tab 4 of the claim all relate to the T-6 job but were not parts for production and TriRAD is not asking the government to reimburse them (tr. 1/183). They were assembled for CO Pritchett who repeatedly asked for such information (tr. 1/183, 192-93).

26. Mr. Reardin testified that the government did not tell him to keep the simulator equipment but government personnel "kept asking questions about it all the time" and if he didn't keep the equipment he would not have been able to make the claim (tr. 1/169). He never received any guidance from the government as to what to do with the simulator equipment (tr. 1/170).

12

27. On 3 September 2013, TriRAD filed a notice of appeal based on a deemed denial with the ASBCA. TriRAD's appeal was docketed on 4 September 2013 as ASBCA No. 58855.

*Final Decision*

28. On 24 September 2013, CO Pritchett issued his final decision denying TriRAD's claim (R4, tab 44). Concerning the pictures, CO Pritchett wrote: "[t]he pictures submitted with the claim are not credible evidence that these simulator parts had been acquired and/or assembled prior to the 3 Aug 11 Termination for Cause" (*id.* at 2). CO Pritchett questioned the material receipts because some were dated after the termination, and stated "[t]he Government cannot accurately determine the amount of materials which had been purchased prior to the termination to support the percentages of completion claimed based on the provided receipts" (*id.* at 3). CO Pritchett questioned the labor records because they were created after the fact by Mr. Reardin and were not corroborated by "cancelled checks, tax documents or other documents to show proof of these employees being employed by TriRAD or being allocated to this contract" (*id.*). CO Pritchett essentially took issue with everything TriRAD claimed and did not change his position that all that was owed, after allowing the payment for the first unit, was $13,385.84 (*id.* at 9). The only costs incurred as a result of the termination that CO Pritchett considered reasonable were one month rent and utilities and the cost to retrieve the first simulator delivered to the Air Force that added up to $13,385.84 (tr. 2/65, 68-71). He believed that TriRAD could have disposed of the equipment and gotten out of the lease rather than continuing to incur lease costs for more than two years (tr. 2/67).

*Site Visit*

29. TriRAD agreed to allow the government to conduct a site visit at its facility in Tampa, Florida, on 18 October 2013 (ex. G-13). Mr. Vanderkarr is a DoD civilian employed at MacDill Air Force base as the project officer for the KC-135 simulator program (tr. 2/154). He conducted the site visit to TriRAD to assess the percentages of completion of the ten simulators (tr. 2/155). Mr. Vanderkarr took pictures during the site visit, and although he did not testify in detail about the pictures, the pictures reflect the same extent of completion documented in Mr. Reardin's pictures (supp. R4, tab 52; tr. 2/160). He reported the results of his inspection in a 4 December 2013 report (tr. 2/156-7; ex. G-13). In the report Mr. Vanderkarr writes, "Per TriRAD's Certified Claim, page 7, chart of Major Cockpit Assemblies Completed at Termination (August 3, 2011) I found Mr. Reardin's percentages of completion for each individual cockpit assembly to be accurate" (ex. G-13 at 1). The report indicates that cockpit subassemblies identified in the chart on page 7 of the claim account for only "50% of the effort required" (ex. G-13 at 1, ¶ 3). Mr. Vanderkarr testified that he felt the percentages of completion presented in the table on page 7 of TriRAD's claim were "fairly well represented" but that he "took exception" with the fact that the dome assembly was not represented in the table (tr. 2/159, 179-80). He believed that there would be a "fair

13

amount of wiring" and "wiring harnesses" involved in populating the cockpit that was not included in the table (tr. 2/159-60). He also questioned the 1.4% associated with final assembly that included alignment of the projection screen (tr. 2/161-62). He believes that the subassembly effort indicated in the table on claim page 7 is 50% of the hardware effort required (tr. 6/163, 170; ex. G-13 at 1, ¶ 3). The report indicated the remaining 50% would be cockpit fabrication, 30%, and final assembly, 20% (ex. G-13 at 1, ¶¶ 4, 5). The report estimated the unit completion percentages as follows: Units 1 & 2 - 100%; Unit 3 – 49%; Unit 4 – 36%; Unit 5 – 28%; Unit 6 – 19%; Unit 7 – 16% and Units 8, 9, 10 – 10% (*id.* at 2-3). Software completion was not considered in these estimates (*id.* at 2, ¶ 6). However, he looked at the deficiencies on the inspection document (ex. G-28) and he believes that a lot were software problems (tr. 2/170-71). Mr. Vanderkarr testified that the percentages of completion in his report are for the hardware, not the software (tr. 2/189). He believed that hardware was 50% and software was 50% of completion (tr. 2/190-91, 197). He did not attempt to estimate the percentage of completion for the software, but if he had it would add to the percentage for the hardware (tr. 2/192). In his report, Mr. Vanderkarr wrote that the residual simulator equipment at TriRAD could not be used in other simulator projects, could not be returned for refunds, and that the cockpit assemblies have no "noteworthy salvage value" (ex. G-13 at 4). On cross-examination, Mr. Vanderkarr agreed that he did not have knowledge of how TriRAD assembled the simulator (tr. 2/178-79), or wired the cockpit assemblies (tr. 2/183). He also did not have knowledge of how much modification was required for the commercial software used by TriRAD (tr. 2/182). CO Pritchett testified that Mr. Vanderkarr's report of his site visit was the first evidence that simulator number 2 was complete, but because TriRAD would not allow Randolph AFB to send an expert to fly it he did not feel he had sufficient information to change his decision (tr. 2/57).

30. Mr. Reardin responded to Mr. Vanderkarr's testimony at the hearing. Mr. Reardin testified that the software TriRAD used in the simulator is COTS and costs less than $100 (tr. 2/200). The software is modular in design and TriRAD "tailored" it for the T-6 simulator (tr. 2/200). Once the software tailoring is done for the first unit it is "done" and then putting it into all remaining units, takes about an hour (tr. 2/201, 211). Software load is accounted for in the final assembly along with the gantry that takes only a couple of hours (tr. 2/201-02, 212). TriRAD does not use wiring harnesses as Mr. Vanderkarr assumed – TriRAD simply uses ethernet cables, "[w]e just buy them off the shelf and plug them in" (tr. 1/57, 2/204). Mr. Vanderkarr's belief that software was 50% of the effort is not correct (tr. 2/201, 203-04). At the point when TriRAD was terminated for cause they had resolved "many, many of the issues" in the inspection reports (tr. 2/206). Unit 2 had "all of that stuff cleaned up" but the Air Force did not want to look at it (tr. 2/206, 213).

31. CO Pritchett testified that he believes that TriRAD is entitled to more money but that the amount is "undeterminable" because of a lack of supporting documentation (tr. 2/109-10).

14

## DECISION

*Contentions of the Parties*

TriRAD contends that it is entitled to be paid based on the percentage of completion of the simulators on its production line at the time of the termination for cause and for other unavoidable charges resulting from the conversion to termination for convenience. TriRAD multiplies the percentage of completion of each of the ten units times the unit price for each totaling $1,494,382 minus $248,600 already paid for the first unit. TriRAD claims $463,052 for unavoidable charges during the time the termination for cause was in effect and $152,479 for unavoidable charges from the conversion to a termination for convenience through 30 June 2013. TriRAD's total claim is $1,861,313.00 (1 July 2013 claim at 3).

The Air Force suggests a vastly different interpretation of FAR 52.212-4(l). The first prong of termination for convenience recovery is, "the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination." The Air Force interprets "work performed" to mean work delivered and accepted (gov't br. at 41-42). Since only one simulator was delivered, but rejected, the Air Force argues, "appellant has failed to establish that any work required by the Contract was performed for purposes of recovery under the first prong, leaving the second prong as its sole means of recovery" (gov't br. at 42). As to the second prong, "plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination," the Air Force argues, "[a]ppellant's 'standard record keeping' was minimal to nonexistent and as a result appellant has failed to demonstrate an amount of the 'reasonable charges" presented in the claim to the government's satisfaction" (gov't br. at 45).

*Commercial Items Contracting*

By way of background for this decision, FAR Part 12 – Acquisition of Commercial Items, establishes "acquisition policies more closely resembling those of the commercial marketplace and encouraging the acquisition of commercial items and components." FAR 12.000. In other words – contracting policy for commercial items is different from other FAR policies and "[w]hen a policy in another part of this chapter is inconsistent with a policy in this part, this Part 12 shall take precedence for the acquisition of commercial items." FAR 12.102(c). The FAR 52.212-4(l) & (m) termination provisions "contain concepts which differ from those contained in the termination clauses prescribed in Part 49 [—Termination of Contracts]" and "the requirements of Part 49 do not apply when terminating contracts for commercial items." FAR 12.403(a).[9] Under FAR Part 49, termination for convenience recovery consists of

_____

[9] We recognize that to the extent that FAR Part 49 does not conflict with Part 12 it may be used as guidance. FAR 12.403(a).

(1) payment for completed goods or services delivered and accepted by the government, and (2) reasonable costs incurred for performance and as a result of the termination. FAR 49.205; 49.206-2(a); 52.249-2(g). Under this approach, a contractor recovers all of its costs of performance and settlement expenses, i.e., is "made whole." By interpreting percentage of completion of the "work performed" as only items delivered and accepted (gov't br. at 42), the Air Force would impose the FAR Part 49 approach to damages on commercial contracts. This violates FAR 12.403(a) and therefore is an unreasonable interpretation. Moreover, the Air Force's interpretation is not consistent with the language of the clause. "Work performed" and "items delivered and accepted" are not synonymous terms.

The Air Force argues that since it cannot audit a commercial contract, "it is incumbent upon appellant to prove what the practice is with respect to payment for undelivered supplies in terminations for convenience in commercial contracts" (gov't br. at 59). The Air Force insists that the contractor provide cost data to determine percentage of completion. The problem with the Air Force's arguments is that it applies the language, "demonstrate to the satisfaction of the Government using its standard record keeping system" to the first prong, percentage of completion, when the language only appears in the second prong, reasonable charges resulting from the termination. It also violates FAR 52.212-4(l) statement that a commercial items contractor "shall not be required to comply with the cost accounting standards or contract cost principles for this purpose" (finding 3). While we accept that a contractor may use its costs as some evidence of a percentage of completion, under the first prong it is the contract price that is the base upon which recovery is predicated, and cost evidence is not required. It is clear to us that CO Pritchett applied the recovery scheme for the second prong of recovery to the first and no cost evidence was required by the clause to prove a percentage of work performed.

*Commercial Items Termination for Convenience Clause*

The Board recently considered and interpreted FAR 52.212-4(l) *Termination for the Government's convenience* but dealt only with the second prong because the contract was terminated before any performance had occurred and thus no production line was involved. *SWR, Inc.*, ASBCA No. 56708, 2014 ASBCA LEXIS 412, at *94-97 (4 December 2014). With respect to the second prong, we held, "[t]he second prong of the sentence providing for payment to the contractor of 'reasonable charges' the contractor can 'demonstrate' 'have resulted from the termination,' when read in conjunction with the first prong of the sentence relating to recovery for work completed, refers to the recovery of those charges incurred that 'do not relate to work completed' but should be reimbursed to fairly compensate the contractor whose contract has been terminated." *SWR, Inc.*, 2014 ASBCA LEXIS 412, at *86. We rejected the government's argument that the second prong only allowed recovery of post-termination settlement charges. We also allowed SWR profit and overhead on non-settlement related charges. *Id.* at *128, 132.

16

Likewise, other cases deal primarily with services or similar contracts that do not involve production lines. *Russell Sand & Gravel Co. v. International Boundary and Water Commission*, CBCA No. 2235, 13 BCA ¶ 35,455 (contract for supply and delivery of embankment material); *Teresa A. McVicker, P.C.*, ASBCA Nos. 57487, 57653, 12-2 BCA ¶ 35,127 (services of two pediatric physician assistants); *Red River Holdings, LLC*, ASBCA No. 56316, 09-2 BCA ¶ 34,304, *transfer granted Red River Holdings, LLC v. Mabus*, 2010 U.S. App. LEXIS 12251 (Fed. Cir. 2010), *rev'd in part, remanded in part*, *Red River Holdings, LLC v. United States*, 802 F. Supp. 2d 648 (D. Md. 2011) (charter of a U.S. flagged vessel); *ALKAI Consultants, LLC*, ASBCA Nos. 56792, 56954, 10-2 BCA ¶ 34,493 at 170,131 (service contract for cleaning a water treatment plant digester "mostly complete"); *Individual Development Associates, Inc.*, ASBCA Nos. 55174, 55188, 06-2 BCA ¶ 33,349 (contract for language instruction). The Air Force cites *United Partition Sys. v. United States*, 90 Fed. Cl. 74 (2009) (gov't br. at 47), but that is a construction case and did not have partially completed items on a production line at termination. Thus, the Air Force incorrectly argues that *United Partition* supports its interpretation that "work performed" means work tendered for acceptance (gov't br. at 51-52). The Air Force also relies on *Hermes Consolidated, Inc. d/b/a/ Wyoming Refining Co.*, ASBCA Nos. 52308, 52309, 02-1 BCA ¶ 31,767, that involved an IDIQ contract for jet fuel. The contract in *Hermes* included the commercial item termination for convenience clause, however, since the government had purchased all of its minimum quantities of fuels, the percentage of completion provision did not come into play. We have considered all of the cases relied upon by the Air Force and find no support for its interpretation of FAR 52.212-4(l) as to the meaning of percentage of completion.

*Prong One – Percentage of Completion*

In a commercial item supply contract where the item is manufactured on a production line, items will likely be in various percentages of completion at termination. Upon termination for convenience, the contractor has completed a "percentage of the work" required by the contract and that percentage is embodied in the items delivered and accepted and the items remaining on the production line (finding 15). The Air Force would have us ignore the items on the production line and consider only finished items that are delivered and accepted (gov't br. at 42). This is not what the plain meaning of FAR 52.212-4(l) requires. FAR 52.212-4(l) makes no reference to items delivered and accepted. Indeed, under the Air Force's asserted interpretation, termination of items delivered in lots could result in the contractor not being paid for perhaps hundreds of completed items, not to mention those items partially completed. This result is clearly at variance with the well known principle that a termination for convenience settlement should fairly compensate a contractor and make the contractor whole for the costs incurred in connection with the terminated work. *SWR Inc.*, 2014 ASBCA LEXIS 412, at *86. We conclude that the only reasonable interpretation of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination" is that it applies to all work performed including partially completed items on the

17

production line at the time of termination. This interpretation establishes a simple mathematical calculation to arrive at compensation that does not require cost data required by Part 49. This is consistent with the language of FAR 52.212-4(l) and the stated intent behind Part 12. Therefore, CO Pritchett's belief that there was nothing in the contract authorizing him to pay for partially complete simulators was incorrect (finding 17).

The methodology for calculating the percentage of the contract price due the contractor is straightforward, for each unit: (1) determine the percentage of completion at termination, and (2) multiply the percentage of completion times the contract price for that unit. Cost and payroll data is not required to prove percentage of completion as CO Pritchett demanded (findings 16-18). The resulting amount will increase the percentage of the price that represents profit, G&A and start-up costs relating to the work performed.

*Acceptability of the First Simulator*

The Air Force contends that because the first simulator delivered failed acceptance testing, the Air Force is not obligated to pay for it (gov't br. at 42). The Air Force asserts, "[a]ppellant failed to demonstrate that even that [sic] one simulator met Contract requirements. Consequently, appellant has failed to establish that any work required by the Contract was performed for purposes of recovery under the first prong, leaving the second prong as its sole means of recovery." (Gov't br. at 42) It is true that the first simulator failed the Air Force's two inspections and TriRAD was terminated for cause as a result (finding 7). However, the Air Force voluntarily converted the termination for cause to a termination for convenience (finding 14), yet the Air Force now resurrects the termination for cause case to support its argument that TriRAD is not entitled to payment for the first simulator or any of the other simulators/components on the production line. The Air Force abandoned[10] any argument that TriRAD was not entitled to be paid pursuant to 52.212-4(l) for work it performed when it converted the termination from one for cause to one for the convenience of the Air Force.

*Percentage of Completion Analysis*

The parties disagree on the percentage of completion. First we consider TriRAD's approach. Mr. Reardin developed TriRAD's percentage of completion based on his knowledge of the production process, drawings and other information (finding 22). The simulator, illustrated in the drawing on page 6 of the claim, is comprised of the cockpit assembly, dome hemisphere assembly (projection screen), and commercial computers, projectors, gantry and software (findings 15, 22). The custom manufactured cockpit

---

[10] The record included many problems with the specification (Level 5 qualified within 1 year (finding 5)) and testing methodology (testing to a "training syllabus" not in the contract (findings 7, 8)), that simply were not included in discovery or otherwise litigated.

18

assembly is the most complex and labor intensive component of the simulator having 14 major subassemblies with over 200 individual parts (*id.*). Mr. Reardin chose to focus his percentage of completion analysis on the cockpit subassemblies. We consider this a reasonable approach. His percentage completion figures are presented in a table on page 7 of the claim. We need not go into much detail concerning the table on page 7 because the Air Force's simulator expert,[11] Mr. Vanderkarr, agrees with Mr. Reardin's percentages, "I found Mr. Reardin's percentages of completion for each individual cockpit assembly to be accurate" (finding 29). TriRAD's claim included pictures of the residual simulator components. Mr. Reardin testified that all production work stopped when the contract was terminated for cause (finding 9) and the parts shown in the pictures existed at the time of that termination. He explained each of the pictures (finding 23). We consider the pictures and Mr. Reardin's testimony to be credible[12] evidence corroborating Mr. Reardin's percentage of completion analysis in the table on page 7.

Although Mr. Vanderkarr agreed with Mr. Reardin's percentage of completion for the cockpit subassemblies, he disagreed that the cockpit subassemblies were representative of the total percentage of completion (finding 29). Mr. Vanderkarr testified that there would be a "fair amount of wiring" and "wiring harnesses" involved in populating the cockpit that was not included in the table (*id.*). He thought the 1.4% for final assembly was low. Mr. Vanderkarr considered the total effort to be allocated as 50% hardware and 50% software. He considered the cockpit subassemblies itemized in the table on page 7 to be only 50% of the total hardware effort and that "cockpit fabrication" was an additional 30% and "final assembly" was 20% (*id.*). He testified that he did not attempt to estimate the percentage of completion of software. However, he reviewed the first unit test results and considered "a lot" of the deficiencies to be software problems. Mr. Vanderkarr admitted he did not actually know how TriRAD assembled and wired the cockpit. (*Id.*) Mr. Vanderkarr's pictures were remarkably similar to TriRAD's and likewise provide credible evidence of the percent of completion at termination as stated by TriRAD.

Comparing the two positions[13] on percentage of completion, we find TriRAD's to be more credible, but not completely accurate. Mr. Reardin effectively rebutted several of Mr. Vanderkarr's observations. He explained that they did not use wiring harnesses as envisioned by Mr. Vanderkarr but just "[plugged] in" "off the shelf" ethernet cables

---

[11] While Mr. Vanderkarr was not formally qualified as an expert witness, TriRAD did not challenge his competence to conduct the site visit.

[12] We reject the Air Force's assertion that "[t]here are a plethora of facts in the record that compels one to question appellant's credibility and thus its claim" (gov't br. at 65).

[13] Neither witness testified that the training requirement (finding 2) should be considered in the percentage of completion calculation nor is it in either party's documents. However, in its brief the Air Force argues training should be deducted (gov't br. at 50). The training was not separately priced and we decline to attempt to speculate its impact on the analysis.

19

(finding 30). The software was inexpensive commercial software of "modular" design and once it was properly "tailored" for one unit it was done. Mr. Reardin testified that shortly after termination the software problems were solved (*id.*).[14] It took only about an hour to load the software into a unit. The gantry assembly took only a couple of hours. (*Id.*) We conclude that Mr. Reardin's testimony was credible and that he is in a much better position to assess percentage of completion than Mr. Vanderkarr.

According to Mr. Vanderkarr the hardware was 50% of the total effort and the cockpit subassemblies (table on page 7) accounted for 50% of the hardware (finding 29). Therefore, according to Mr. Vanderkarr, the cockpit subassembly was 25% of the total work. The other 50% of the total effort was software (*id.*). Therefore, according to Mr. Vanderkarr, the residual hardware seen in the pictures represented only 25% of the total effort. The first two simulators (of ten), that both sides agree are 100% complete, are, therefore, 20% of the contract. To accept Mr. Vanderkarr's percentage analysis would mean that all of the other equipment shown in the pictures was only 5% of the work. We do not accept this conclusion. It is clear to the Board that the pictures, taken by both parties, and Mr. Reardin's testimony establish a greater than 25% completion and we cannot accept Mr. Vanderkarr's percentage calculations.

In its brief the Air Force contends that the percentage of completion calculation must be supported by payroll and cost records, among other things:

> The percentage of work performed included in the claim for Units Two through Ten is unreliable and unsupported; the claim has only a single spreadsheet to support appellant's calculations. There are no corroborating documents in the claim or in the record to substantiate appellant's estimates, i.e., no records of man-hours or costs incurred. Appellant did not use any sort of schedule to track its progress during the performance period, nor did it track what units, subassemblies or projects its employees worked on. In fact, Appellant's declaration that it took 1,232 man-hours to create just the cockpit subassemblies – not an entire simulator – is mere conjecture.
>
> ....
>
> ...Appellant contends that it has no record of its costs incurred nor any record of the costs it based its initial proposal on. The lack of any cost data is incredible

---

[14] We have no evidence one way or the other on this contention because the Air Force refused to "fly" Unit 2 shortly after termination and TriRAD refused to allow the Air Force to "fly" the unit shortly before trial (findings 9, 29).

considering that this Contract is appellant's largest contract to date as a prime contractor and is contrary to the general principle expressed in FAR 32.201-2(d) that contractors are responsible for keeping records adequate to demonstrate costs claimed to have been incurred. [Citations omitted]

(Gov't br. at 60-61) The Air Force insists that TriRAD comply with FAR 32.201-2(d). FAR 52.212-4(l) specifically states that "[t]he Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose" (finding 3). FAR 32.201(d) is a "contract cost principle." We have rejected the position that the percent of completion must be proven with cost records earlier in this decision.

*Prong Two – Reasonable Charges*

We follow the guidance in our recent decision in *SWR*. Prong two affords the contractor the ability to recover charges not recovered in prong one's percentage of completion calculation that provides "fair compensation." *SWR, Inc.*, 2014 ASBCA LEXIS 412, at *92. TriRAD may recover profit on the prong two amount except for settlement expenses and G&A indirect cost. *Id.* at *128, 132.

*Quantum*

*Percentage of Completion*

We disagree with TriRAD's 61.11% total completion percentage as it includes start-up costs (finding 15). We find the tables on claim pages 7 and 10 to be credible. On page 10 TriRAD multiplies its percentages of completion times the unit prices. This is consistent with the procedure specified in FAR 52.212-4(l). TriRAD arrives at $1,372,761 or 56.141% of the total contract value including the amount already paid for Unit 1. (Claim at 10)[15] We do not agree that any costs may be added to this figure because the prong one recovery is based on the percentage calculation specified in FAR 52.212-4(l) and the contract's price (finding 22). We hold that the correct percentage of completion is 56.141% and TriRAD is entitled to $1,372,761 less $248,600 (for the payment made for Unit 1) or $1,124,161 based on percentage of completion.[16] This amount includes profit, overhead and start-up costs amortized in the price for work that was performed. We discuss the date when interest starts later in this decision.

[15] TriRAD treated its claim as if it were its Rule 4 documents, but failed to separately identify it with tab numbers. Therefore, we cite to the claim and consider it to be part of TriRAD's Rule 4.

[16] The Air Force argues that we should deduct $15,000 because the units were never FAA certified (gov't br. at 50), but that amount is too speculative for us to adopt. It also wants us to deduct freight (gov't br. at 51), but that is not contemplated in FAR 52.212-4(l).

21

*Reasonable Charges Resulting from the Termination*

The Air Force persists in its argument that TriRAD must produce cost data that the termination clause of the contract specifically states is not required to be produced to recover these charges:

> Appellant's "standard record keeping" was minimal to nonexistent and as [a] result appellant has failed to demonstrate an amount of the "reasonable charges" presented in the claim to the government's satisfaction. The contracting officer testified at the hearing that it was impossible to determine whether the charges in the claim reflect material for the Contract, charges that could have been avoided, or costs incurred in anticipation of the Contract [being] fully performed. The charges in the claim are so speculative and so unsubstantiated that the contracting officer testified that he would have lost his job had he recommended compensating appellant for them. [Citations omitted]

(Gov't br. at 45) The Air Force's interpretation of FAR 52.212-4(l) is the same as what is required in Part 49 that is specifically made inapplicable by FAR Part 12.

*Uncompensated Start-Up Costs*

TriRAD is also entitled to reimbursement of its uncompensated start-up costs. We have held that the percentage of completion amounts included a percentage of start-up costs. Start-up costs would have been allocated to all of the simulators and since the total percent of completion is 56.14% there remain 43.86% of start-up costs that are not compensated in the percent completion amount. The difficulty is that TriRAD presents two different explanations for start-up costs (finding 22). There was no testimony explaining these differing costs and we are left only with the claim documents to draw what conclusions we can. The contract was awarded on 28 February 2011 (finding 1). The start-up costs in the claim includes invoices from The Visual Group, Inc., for $48,360 in software costs for billing periods from 19 February 2011 through 3 June 2011 (claim, tab 1 at 1-1-6 to 1-1-12). The start-up costs also include an invoice from YounGraphix, Inc., for drawings dated 18 May 2011 for $15,399 (claim, tab 1 at 1-1-14). We accept these invoices as evidence of start-up costs. The total for start-up costs is therefore $63,759. We do not accept the other purported evidence of start-up costs due to the conflicts noted (finding 22). Accordingly we allow 43.86% of $63,759 or $27,964.70 in start-up costs not compensated in the percentage of work performed calculation amount. TriRAD is entitled to profit and overhead on this amount.

22

*Other Reasonable Charges from 3 August 2011 to 24 October 2012*

This is the period of time when the contract remained terminated for cause. The conversion to a termination for convenience relates back to the date of termination for cause, 3 August 2011. *Space Dynamics Corp.*, ASBCA No. 25106, 81-2 BCA ¶ 15,205 at 75,286; *Q.V.S. Inc.*, ASBCA No. 7513, 1963 BCA ¶ 3699 at 18,494. Therefore, "reasonable charges" during this time period are eligible to be considered as charges under FAR 52.121-4(1). TriRAD claims $329,895 in labor costs for Mr. Reardin, Mr. Daab, and Ms. Price during this period (app. claim, tab 2 at 2-1). Very little if any of the labor expended during this time was on the termination for convenience settlement proposal and claim. Testimony reveals that during this time Mr. Reardin and Mr. Daab were attempting to persuade the government to reinstate the contract (finding 24). TriRAD presents no other evidence proving that these costs were reasonably necessitated by the termination for convenience. We do not recognize these costs as resulting from the termination for convenience.

TriRAD claims $22,838 for severance payments to its employees (claim, tab 2 at 2-1). Testimony reveals that TriRAD had no legal obligation to pay these costs (finding 24). The severance costs were therefore avoidable and not recoverable. TriRAD claims $17,507 in legal fees and $4,449 in accounting fees incurred during this period (claim, tab 2 at 2-1). These costs were caused by the termination for cause, not the termination for convenience and are not reasonable. TriRAD claims $1,954 in costs associated with removing the simulator from Randolph AFB (*id.*). CO Pritchett allowed $7,404.44 for "simulator retrieval" in his final decision (finding 18). It is not clear from the record if TriRAD ever submitted an invoice and was paid the $13,385.84 allowed in the Air Force's 11 June 2013 decision (finding 19). The $13,385.84 consists of simulator retrieval ($7,404.44), one-month rent ($4,895) and one month utilities ($1,086.40) (*id.*).[17] The rent and utilities are accounted for elsewhere in our decision. TriRAD claimed $86,409 for facility costs; we deal with that separately later in this decision.

*Reasonable Charges from 25 October 2012 to 30 June 2013*

This is the period after the conversion to a termination for convenience up until TriRAD submitted its properly certified claim. TriRAD claims $107,531 for monthly labor by Mr. Reardin, Mr. Daab and Ms. Price (claim, tab 3 at 3-1). In its claim TriRAD contends that during this time Mr. Reardin, Mr. Daab and Ms. Price were engaged in drafting the settlement proposal and claim, responding to requests for information from the government and generally attempting to recover its money (claim at 13). We agree that during this time TriRAD expended effort to (1) develop its percentage of completion data, (2) produce a settlement proposal and certified termination for convenience claim

---

[17] If the $1,954 (TriRAD's claimed amount) has not been paid, it should be added to the quantum amount.

with pictures and other supporting data,[18] and (3) respond to numerous requests from the government for cost data. Costs associated with these efforts are clearly necessitated by the termination for convenience or government requests for information and are recoverable by TriRAD.

The termination for convenience clause specifically provides that a contractor may recover, "reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination" (finding 3). We do not interpret the language "using its standard record keeping system" so narrowly as to preclude recovery if a contractor's "standard record keeping system" is lacking sophistication (finding 17 n.4). Indeed, in *SWR* we relied upon "records other than the contractor's own standard record keeping system, e.g., contemporaneous Army and SWR emails discussing the Pineridge Farms site lease" when we allowed SWR to recover a $15,000 payment to end a lease. *SWR, Inc.*, 2014 ASBCA LEXIS 412, at *104 n.4.

The conversion to a termination for convenience occurred on 24 October 2012 (finding 14). The first settlement proposal was submitted on 3 November 2012 (finding 15). On 10 December 2012, CO Pritchett asked for cost data (finding 16). On 17 December 2012 TriRAD submitted 283 pages of data (*id.*). On 6 March 2013, CO Pritchett requested more cost data (finding 17). On 11 March 2013, TriRAD submitted an additional 152 pages of data (*id.*). The "2nd Revised and re-Certified" claim was submitted on 1 July 2013 (finding 21). For the time period of October 2012 through January 2013 TriRAD claims a monthly direct labor charge for Mr. Reardin of $11,676 (claim, tab 2 at 2-1, tab 3 at 3-1). Mr. Reardin's monthly direct labor charge drops to $5,834 for February 2013 through June 2013 (claim, tab 3 at 3-1). Ms. Price's claimed direct labor is a constant $1,735 (claim, tab 2 at 2-1, tab 3 at 3-1). Mr. Daab's claimed direct labor varies each month from a high of $9,660 in October 2012 to a low of $2,048 in April 2013 (*id.*). TriRAD claims a total of $23,071 for October 2012 and $22,441 for November 2012. We conclude that one month[19] is a reasonable amount of time to create the settlement proposal, including completion percentages, and conclude that $23,000 is a reasonable amount for that effort. TriRAD took seven days to respond to CO Pritchett's 10 December 2012 request for information. We conclude that seven days is a reasonable period of time to respond. Therefore TriRAD is entitled to 22.58% (7 days/31 days) of its claimed direct labor for December 2012 or .2258 x $17,034 = $3,846.28. TriRAD took six days to respond to CO Pritchett's 6 March 2013 request for more data. We conclude six days is a reasonable time to respond. Therefore TriRAD is entitled to 19.35% (6 days/31 days) of its claimed direct labor for March 2013 or .1935 x $10,036 =

---

[18] We recognize that much of this data was created after the fact in an attempt to satisfy the government (tr. 1/188-89).

[19] We recognize that there are only eleven days between the conversion on 24 October 2012 and the settlement proposal on 3 November 2012, but we believe some work on it must have occurred before 24 October and think a month is reasonable.

$1,941.96. TriRAD submitted its "2nd Revised and re-Certified" claim on 1 July 2013 (finding 21). This version of the claim included the information in the 3 November 2012 termination for convenience settlement proposal but added much more including pictures and contemporaneous and recreated cost information (findings 21-25). As before, we conclude that one month labor would be a reasonable time to allow for creation of the claim. For the month of June 2013, TriRAD claimed labor for Mr. Reardin ($5,834), Mr. Daab ($2,730) and Ms. Price ($1,735) for a total of $10,299. We conclude this is a reasonable amount to allow for preparation of the second version of the claim. We must also determine a reasonable amount to allow for the site visit on 18 October 2013 (finding 29). We conclude that $1,000.00 is a reasonable amount to allow TriRAD for conducting the site visit. Thus the total reasonable charges for this period is $40,087.24 ($23,000.00+ $3,846.28 + $1,941.96 + $10,299.00 + $1,000).

*Storage Costs*

The government contends that only one month of rent was due TriRAD for storing the simulator equipment reasoning that TriRAD could have immediately gotten rid of the equipment and cancelled the lease (finding 28). We do not agree this is reasonable because the termination for convenience relates back to 3 August 2011, the residual equipment was essential to TriRAD's ability to develop its termination for convenience claim, and the Air Force gave no direction to TriRAD. TriRAD claims $4,895 for each month's lease payments (claim, tab 2 at 201, tab 3 at 3-1). The support for this amount is a copy of the third amendment of the lease dated 17 March 2012 (claim, tab 2 at 2-1-13), a "Statement" (*id.* at 2-1-12) and Mr. Reardin's testimony that he paid the claimed amounts (findings 24, 25). CO Pritchett agreed that TriRAD had presented evidence of lease payments (finding 24). The monthly base rent was $3,073.85 (claim, tab 2 at 2-1-13). The lease required TriRAD to pay "all applicable Florida sales and other tax on all payments" (*id.*). The "Statement" shows how the $4,895 was calculated: base rent ($3,073.85) + operating expense ($1,501.18) + tax on base rent ($215.17) + tax on operating expense ($105.08) = $4,895.28 (claim, tab 2 at 2-1-12). We consider Mr. Reardin to be a credible witness and accept that TriRAD paid $4,895 per month for the facility. In his testimony, CO Pritchett did not dispute this amount. We also accept the claimed utilities and miscellaneous costs.[20] For the approximate fourteen months between 3 August 2011 and 24 October 2012, TriRAD claims $86,409 for facilities and utilities (claim at 11) for an average of $6,172 per month. For the approximate eight months between 24 October 2012 and 30 June 2013, TriRAD claims $44,948 for facilities and utilities (claim at 13) for an average of $5,619 per month.

Now we must determine a reasonable number of months to use to multiply these average monthly facilities and utilities costs by to arrive at a reasonable amount. We start with the fact that the Air Force put TriRAD in this position by first terminating TriRAD on 3 August 2011 for cause and then fifteen months later on 24 October 2012 converting

---

[20] The claim includes actual receipts for some of these costs (claim, tabs 2, 3, 4).

to a termination for convenience. We also note that the Air Force gave no direction to TriRAD as to disposition of the items and that after the conversion the Air Force asked repeatedly for cost information and a site visit to observe the items (findings 16, 17, 26). Mr. Vanderkarr testified that the residual items could not be returned and it had no "noteworthy salvage value" (finding 29). We take into consideration that TriRAD refused repeated government requests for a site visit (findings 16, 17) that logically made it difficult for CO Pritchett to assess the claim. We also take into consideration that CO Pritchett testified the contract did not allow him to pay for partially complete simulators (finding 17), a position we have found to be incorrect. The first time CO Pritchett received pictures of the residual equipment was with the second version of the claim submitted on 1 July 2013 (finding 21) but he found them "not credible evidence" (finding 28). Looking at the pictures, we do not understand how CO Pritchett could reach that conclusion.[21] Because we relate back the termination for convenience to 3 August 2011, we charge the government with storage costs from the date of termination for cause through submission of the termination for convenience settlement proposal on 3 November 2012 (finding 15). We decline to grant TriRAD more storage time because of what we consider TriRAD's unreasonable and frankly inexplicable refusal to allow a site visit that would have greatly assisted the government in its ability to assess the claim. TriRAD also failed to include pictures in its initial settlement proposal that we view as impeding the Air Force's ability to assess the claim. After the conversion both parties made bad decisions. The Air Force ignored TriRAD's percentage calculations and pictures and demanded cost information that is clearly not envisioned by the commercial items clause, FAR 52.212-4(l). We allowed labor hours for TriRAD's responding to these unnecessary requests, but do not allow storage time because TriRAD refused to allow a site visit and failed to provide the Air Force the pictures earlier when it easily could have. Therefore, we conclude that TriRAD is entitled to storage costs from 3 August 2011 to 3 November 2012.[22] We conclude that TriRAD could have disposed of the items, cancelled the lease, and ended the storage costs during November 2012 if it had allowed the site visit and documented the residual items with pictures, thereby preserving the evidence needed to litigate its termination for convenience case. At that time there would be no need for TriRAD to continue to store the residual simulator items. The costs were avoidable and therefore not recoverable under the clause. We therefore allow TriRAD $86,409 for facilities and utilities from 3 August 2011 through 24 October 2012 and $1,873 for 25 October 2012 through 3 November 2012 (ten days at $187.30 per day) for a total of $88,282.

---

[21] We have no evidence that CO Pritchett ever asked TriRAD if the pictures represented the state of production on the date of termination for cause. Mr. Reardin testified that it did (finding 23).

[22] Mr. Reardin testified that the building was not used for other contract work (finding 24). Taking this into account and the pictures (claim, tab 1 at 1-2-1 to 1-3-7), we are not able nor are we inclined to attempt to assign a percentage of the lease to storing the residual items.

The Air Force estimates that the residual items only took up about 10% to 20% of the warehouse space and that other work could be accomplished in the unused space and the office space (gov't br. at 75-76). The Air Force believes a downward adjustment is merited. Judging from the pictures in the claim and testimony (finding 23), we think the Air Force's utilization estimate is low. We think it would have been impractical for TriRAD to relocate the residual supplies and decline to reduce the $88,282 by some percentage as suggested by the Air Force.

Appellant makes a variety of other arguments that have all been carefully considered by the Board, but we did not feel necessitate discussion in this decision. We also did not discuss the Air Force's quantum arguments that we agree with.

In awarding costs to TriRAD we give weight to CO Pritchett's testimony that TriRAD is owed more money but that he was unable to determine how much (finding 31). The amounts due TriRAD are summarized as follows:

| $1,124,161.00 | Percentage of Completion |
|---|---|
| $27,964.70 | Uncompensated Start-up Costs |
| * | Costs 3 August 2011 to 24 October 2012 |
| $40,087.24 | Costs 25 October 2012 to 30 June 2013 |
| $88,282.00 | Storage Costs |
| $1,280,494.94 | Total |

*Add $1,954 in removal costs if they have not been paid as part of the $7,404.44 (finding 18).

*Profit & Overhead / G&A*

TriRAD has not proven what its profit and overhead/G&A amounts (percentages) are and we do not speculate as to what they might be.

*Interest Accrual Date*

On 3 November 2012 TriRAD submitted its termination for convenience settlement proposal in the amount of $1,803,993.00 (finding 15). The proposal was submitted with an SF 1436 form that included a pre-printed certification (*id.*). The certification does not comply with the certification requirements of the CDA but is correctable. TriRAD submitted its "2nd Revised and re-Certified" claim on 1 July 2013 (finding 21). The claim included a proper CDA certification (*id.*). A termination for convenience settlement proposal that contains the pre-printed certification found on SF 1436 (as TriRAD did[23]) becomes a CDA claim, eligible for CDA interest, when the parties reach an impasse in their negotiations on the proposal. *James M. Ellett Construction Co. v. United States*, 93 F.3d 1537 (Fed. Cir. 1996); *Optical E.T.C., Inc.*, ASBCA No. 53350, 04-1 BCA ¶ 32,608 at 161,385-86. We conclude that the

---

[23] The certification was corrected on 1 July 2013 (finding 21).

parties here reach an impasse by TriRAD's 13 June 2013 email to the CO rejecting the government's settlement offer and saying it would seek the assistance of the ASBCA (finding 20). Therefore, TriRAD's proposal "became a claim" that was "received" by CO Pritchett on 13 June 2013.

## CONCLUSION

TriRAD's appeal is sustained in the amount of $1,280,494.94. CDA interest will commence on 13 June 2013.

Dated: 23 February 2015

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58855, Appeal of TriRAD Technologies Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

28